WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Cains, et al., | No. CV-16-01306-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Elisa Grassi, et al., | |
| Defendants. | |

Plaintiffs and Defendants are involved in the purchase, sale, and marketing of Arabian horses. In 2013, Defendants allegedly took numerous actions meant to "ruin" Plaintiffs' reputations and prospects in the Arabian horse industry. Before the present suit was filed, Plaintiffs and Defendants were involved in another lawsuit, also pending in the District of Arizona. Plaintiffs served Defendants with the summons and complaint in the present suit while Defendants were in Arizona for depositions in that separate lawsuit. Defendants now argue they were immune from service of process while in Arizona. Defendants also argue, assuming they were immune from service of process, personal jurisdiction does not exist. Finally, Defendants argue the complaint fails to state claims on which relief can be granted. Only this last contention has merit.

## BACKGROUND

Plaintiffs David Cains and Scott Bailey live in Arizona and work in the Arabian horse industry. Bailey owns and operates Stonewall Farms Arabians, LLC, as well as Knight Media Networks, Inc. The complaint does not explain the nature of these two

1  entities' activities but it appears Stonewall buys and sells horses while Knight owns and
2  operates the "Arabhorse.com network."  That network apparently operates horse-related
3  websites for third parties.  (Doc. 12 at 6).

4         Defendant Elisa Grassi works as an "independent contractor" for "persons and
5  entities who own Arabian horses."  (Doc. 13-1 at 2).  Ms. Grassi performs this work with
6  her "significant other and life partner," Frank Sponle.  Grassi and Sponle live in Germany
7  but they conduct their business around the world.  That business consists of "finding
8  horses (or interests in horses such as breeding or embryos) for [their] clients to buy."
9  (Doc. 13-1 at 2).  One of their clients is Sheikh Ammar bin Humaid Al Nuaimi, the
10 Crown Prince of the Emirate of Ajman.

11        As of February 2012, Stonewall owned a horse named La Bella Versace.  In late
12 February 2012, Grassi, acting on behalf of Sheikh Ammar, expressed an interest in
13 purchasing La Bella Versace.  Cains informed Grassi that any sale would have to include
14 a right for Cains to retrieve two embryos from La Bella Versace.  Grassi agreed to this
15 condition provided "the embryos were retrieved before La Bella Versace was shipped out
16 of the United States."  (Doc. 12 at 4).  Stonewall sold the horse to Sheikh Ammar on
17 February 25, 2012.  After that date, but before La Bella Versace left Arizona, Cains
18 retrieved two embryos from La Bella Versace.  Once the embryos were retrieved, La
19 Bella Versace was shipped to California.

20        In 2013, Cains and Bailey "acted as Sheikh Ammar's agent" in purchasing a horse
21 for him at the Scottsdale Arabian Horse Show.  (Doc. 12 at 5).  Grassi and Sponle were
22 not involved in this transaction but they later demanded they receive a commission from
23 Cains and Bailey based on that sale.  After Cains and Bailey refused to pay a
24 commission, "Grassi told Bailey 'I will ruin you in the Arabian horse business.'"  (Doc.
25 12 at 5). Grassi and Sponle then "began a campaign to financially ruin [Plaintiffs] . . . by
26 making false statements about the Plaintiffs to others in the Arabian Horse Industry."
27 (Doc. 12 at 6).  The centerpiece of that campaign consisted of Grassi and Sponle telling
28 third parties that "Bailey, Cains and/or Stonewall stole horse embryos from Sheikh

Ammar." (Doc. 12 at 7). Grassi and Sponle based this on the fact that embryos were retrieved from La Bella Versace after Sheikh Ammar purchased her on February 25. Grassi and Sponle also removed their website from Bailey's Arabhorse.com network and induced others to remove their websites as well.

On April 16, 2015, a business entity known as Ajman Stud sued Cains, Bailey, and Stonewall for breach of contract. (CV-15-1045-DJH, Doc. 1-1 at 34). According to the complaint in that action, Sheikh Ammar had transferred all of his interest in La Bella Versace to Ajman Stud sometime prior to the suit being filed. The complaint alleged the retrieval of embryos after Sheikh Ammar owned La Bella Versace constituted a breach of the purchase agreement. In June 2015, Cains, Bailey, and Stonewall answered the complaint and the following month the court issued a scheduling order. In early October 2015, the parties sought a ruling from the court on a discovery dispute regarding depositions.

According to the parties' discovery dispute filing, Cains, Bailey, and Stonewall wished to depose Sheikh Ammar, Grassi, and Sponle. The parties could not agree on whether the depositions were appropriate and, if they were, where they should occur. The court resolved the dispute by directing Cains, Bailey, and Stonewall to issue written interrogatories to Sheikh Ammar in lieu of his deposition. The court stated, however, that Grassi and Sponle could be deposed in Arizona. The relevant portion of the court's order stated "The Court will grant Defendants' request to take the depositions of Mr. Sponle and Ms. Grassi in Arizona." Grassi and Sponle believed that order was binding on them.[1] After the order, the parties negotiated dates for the depositions, scheduling them for April 12 and 13, 2016. (Doc. 17-4).

---

[1] This belief is evidenced by statements by Grassi and Sponle in their motion to dismiss as well as their declarations. The motion argues Grassi's and Sponle's "attendance was required by court order" and they were in Arizona "pursuant to a court order." (Doc. 13 at 5, 7). In their declarations, Grassi and Sponle both state the court "required [they] be made available for deposition in . . . Arizona." (Doc. 13-1 at 4, 13-2 at 4).

1  On April 11, Grassi and Sponle traveled from Germany to Arizona. Grassi was
2  deposed on April 12. On April 13—the day of Sponle's deposition—Cains, Bailey,
3  Stonewall, and Knight filed the present suit against Grassi and Sponle. At the conclusion
4  of Sponle's deposition, Grassi and Sponle were served with the complaint and summons
5  in the present suit. Thus, Grassi and Sponle were physically present in Arizona at the
6  time they were served. After being served, Grassi and Sponle returned to Germany. A
7  short while later, they filed a motion to dismiss arguing they had not been properly
8  served, personal jurisdiction did not exist, and the complaint fails to state claims for
9  relief.

## ANALYSIS

11 Normally, a challenge to personal jurisdiction presents a "threshold matter" that
12 must be resolved before any other issue. *Sandpiper Vill. Condo. Ass'n., Inc. v.*
13 *Louisiana-Pac. Corp.*, 428 F.3d 831, 840 (9th Cir. 2005). In this case, however, the issue
14 of service of process may dictate the outcome of the personal jurisdiction dispute. That
15 is, Grassi and Sponle were in Arizona when they were served and personal jurisdiction
16 will exist if that service were permissible. *See Burnham v. Superior Court of California,*
17 *Cty. of Marin*, 495 U.S. 604, 610 (1990) ("Among the most firmly established principles
18 of personal jurisdiction in American tradition is that the courts of a State have jurisdiction
19 over nonresidents who are physically present in the State."). Therefore, the propriety of
20 service will be addressed first.

21 **I. Service was Proper**

22 This case was filed in state court and was still in state court at the time Grassi and
23 Sponle were served. Because of that, whether service was proper "is strictly a state law
24 issue."[2]  *Lee v. City of Beaumont*, 12 F.3d 933, 936-37 (9th Cir. 1993), *overruled on*

---

[2] The parties do not discuss whether Arizona or federal law applies and there is substantial disagreement amongst courts on this issue. *See, e.g.*, *Pointer v. Ghavam*, 107 F.R.D. 262, 264 (E.D. Ark. 1985) (discussing issue and citing cases). It appears, however, that when service is attempted before removal, state law should control the issue. *Id.* (when service is completed before removal "the case for using state law, either under *Erie* principles or under comity principles, becomes overwhelming"). Because Arizona law applies, Grassi's and Sponle's reliance on *Moylan v. AMF Overseas Corp.*,

*other grounds by California Dep't of Water Res. v. Powerex Corp.,* 533 F.3d 1087 (9th Cir. 2008). Under Arizona law, it is Plaintiffs' burden to prove proper service. *See Pioneer Fed. Sav. Bank v. Driver*, 804 P.2d 118, 122 (Ariz. Ct. App. 1990).

According to Grassi and Sponle, Arizona law rendered them immune from service because the only reason they were in Arizona was the court's order in the related suit. This immunity, referred to as "process immunity," is rarely invoked and is a surprisingly difficult issue to resolve. As recognized by a court over one hundred years ago, process immunity has "engaged the attention of common-law courts under every conceivable variety of circumstances" and courts have written "[v]olumes of opinions" consisting of "conflicting decisions and almost any dictum that one may be looking for." *Netograph Mfg. Co. v. Scrugham*, 90 N.E. 962, 962 (Court of Appeals N.Y. 1910). Fortunately, Arizona has issued relatively few decisions on process immunity. Unfortunately, those decisions do not provide clear guidance.

The earliest Arizona decision discussing process immunity appears to be an Arizona Supreme Court decision from 1921. In *Rizo v. Burruel*, 202 P. 234, a citizen of Mexico "instituted in the superior court of Yuma county habeas corpus proceedings to recover the possession" of his daughter from a couple who had been caring for the child for the previous seven years. 202 P. at 235. When the father showed up for the hearing on his habeas corpus proceedings, he was served with a petition for adoption filed by the couple. The father argued he was immune from service of process because he was in Arizona "for the sole purpose of prosecuting a writ of habeas corpus." *Id.* The trial court rejected this argument and, after a trial, granted the adoption petition and denied the petition for writ of habeas corpus. On appeal, the Arizona Supreme Court rejected the father's position regarding process immunity. In doing so, however, the court quoted from another opinion that seemed to squarely support the father's position.

---

354 F.2d 825 (9th Cir. 1965), is not convincing. That case was litigated in Guam and involved a witness who had voluntarily traveled to Guam to testify on behalf of his employer. In determining the witness was immune from service, the Ninth Circuit appears to have applied only federal law. *Id.* at 829.

As quoted by the Arizona Supreme Court, the Supreme Court of Tennessee had recently held "[s]uitors, whether plaintiff or defendant, from a foreign jurisdiction are exempt from the service of civil process while attending court and for such reasonable time before and after trial as may enable them to go from and return to their homes." *Id.* (quoting *Sofge v. Lowe*, 176 S.W. 106 (1915)). The Arizona Supreme Court concluded this broad view of the immunity was inappropriate in the particular factual circumstances it was reviewing because the habeas corpus proceedings and the petition for adoption presented "the same question." *Id.* at 236. The court's reasoning seems to have been that granting the father immunity from service of process would not have accomplished anything as the ultimate issue—custody of the child—would have been resolved either in the habeas corpus proceedings or the adoption proceedings. Thus, the court concluded process immunity was not applicable but made clear it was not deciding what general "rule of immunity" should apply in future cases. *Id.*

No Arizona appellate court discussed the process immunity holding from *Rizo* until 1965. That year, in *Turner v. Viault*, 400 P.2d 599, the Arizona Court of Appeals addressed whether process immunity applied to an individual who had agreed to voluntarily appear in Arizona for depositions in a suit between two other parties. The individual came to Arizona and was served during his depositions. The trial court granted a motion to quash that service. On appeal, the court began its analysis by quoting at length from *Rizo*. The court then quoted from *Lamb v. Schmitt*, an intervening decision by the United States Supreme Court addressing process immunity. As explained in *Lamb*, process immunity was meant to promote "the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation." 285 U.S. 222, 225 (1932). And limitations on process immunity had been recognized where "the service was made on one whose attendance was not voluntary." *Id.* at 226. In those situations, service of process "had no tendency to interfere with judicial administration." *Id.*

Relying on this language from *Lamb*, as well as language from *Rizo*, the court of appeals in *Turner* held the "basic principles of exemption of service of process" mandated the service be quashed. 400 P.2d at 601. It is unclear what "basic principles" the court of appeals was divining from *Rizo* and *Lamb*. In particular, it is unclear if the court was resting its decision on the witness voluntarily appearing in Arizona or if some other consideration mandated the result.

The only additional Arizona authority comes from a 1977 case that, quoting *Turner*, stressed process immunity "should not be enlarged beyond the reason upon which it is founded, and that it should be extended or withheld only as judicial necessities require." *Bradford v. Nat'l Distillers & Chem. Corp.*, 571 P.2d 1040, 1041 (Ariz. Ct. App. 1977). That case, however, did not engage with the merits of process immunity because the question presented was whether process immunity was waived by a failure to exert it. *Id.*

In light of these Arizona cases, process immunity must be assessed under a fact-specific analysis, taking due consideration of the "judicial necessities" at issue. *Id.* In other words, Arizona law does not recognize any bright-line rules involving process immunity. Instead, the circumstances of each case will dictate whether process immunity is appropriate. Of particular importance, Arizona seems to have a practical view of process immunity, recognizing it is a discretionary matter that should turn on "judicial necessities" rather than the interests of the litigants. *Id.*

Arizona law is not unique in failing to provide clear rules to govern process immunity. As noted earlier, courts outside of Arizona have reached conflicting decisions providing support for almost any formulation of process immunity a court wishes to deploy. *See Netograph Mfg. Co. v. Scrugham*, 90 N.E. 962, 962 (N.Y. 1910). Generally, however, courts outside of Arizona have been less likely to apply process immunity in two circumstances. First, some courts have concluded process immunity "is designed to encourage nonresident witnesses to voluntarily enter a jurisdiction." *Am. Centennial Ins. Co. v. Handal*, 901 F. Supp. 892, 895 (D.N.J. 1995). Thus, a grant of process immunity

is appropriate "where a district court wishes to shield an individual from service of process to encourage his or her travel to the forum state." *N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 63 (1st Cir. 2001). When a witness is present due to a court order, *i.e.* involuntarily, process immunity often is not granted.

The second circumstance where other courts have not granted process immunity is "where the action in which process is sought to be served is related to the action which is responsible for the person being present in the jurisdiction." *Pointer v. Ghavam*, 107 F.R.D. 262, 264 (E.D. Ark. 1985). *See also ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1460 (10th Cir. 1995) (process immunity does not apply when witness was in location due to related action). Courts have not delineated clear rules for how close of relationship between the two actions is required. Instead, there appears to be a general guideline that the cases either involve the same parties, the same facts, or one case arose as a direct consequence of the other. When two actions are sufficiently related, "good judicial administration demands [their] prompt determination . . . and that immunity should be withheld." Immunity from Service of Process—Immunity in Related Actions, 4A Fed. Prac. & Proc. Civ. § 1080 (4th ed.).

The two circumstances where process immunity often is rejected are present here. Addressing first the voluntary nature of Grassi's and Sponle's presence in Arizona, their motion and declarations described their attendance as "required by court order." (Doc. 13 at 5). Based on their filings, Grassi and Sponle seemed to be arguing they were in Arizona involuntarily. But at oral argument defense counsel changed strategy and argued Grassi and Sponle came to Arizona voluntarily. According to defense counsel's oral argument, the order for Grassi and Sponle to appear in Arizona was not binding because the court hearing the other suit did not have jurisdiction over them at the time it ordered them to appear in Arizona. Thus, defense counsel argued process immunity would be appropriate because it would reward Grassi and Sponle for voluntarily coming to Arizona. While presenting a difficult issue, defense counsel's current approach is flawed under the undisputed facts.

1       Whether the court hearing the other suit had jurisdiction over Grassi and Sponle to
2  require their attendance in Arizona is not an issue properly litigated in this case.  If Grassi
3  and Sponle believed the order requiring their attendance had no basis, they could have
4  filed a motion asking for reconsideration or at least clarification on whether compliance
5  was mandatory.  The other court then could have explained the jurisdictional basis for its
6  order.  That would have been helpful because the other court may have had jurisdiction
7  over Grassi and Sponle.  *Cf. S. Seas Catamaran, Inc. v. Motor Vessel Leeway*, 120 F.R.D.
8  17, 21 (D.N.J. 1988) (noting "general rule requir[es] plaintiff or its agents to appear for
9  the taking of depositions in the district in which the suit is brought").  Grassi's and
10 Sponle's failure to litigate jurisdiction in the other case left the precise basis for the
11 discovery order unclear.  This Court is hesitant to interpret the order as having no basis
12 such that Grassi and Sponle were, in fact, free to ignore it.

13      But even assuming there were some flaw with the other court's discovery order,
14 the most important developments after that order were Grassi's and Sponle's
15 interpretation of it and their actions based on it.  In seeking process immunity in this case,
16 they repeatedly described their trip to Arizona as if they had no choice in the matter.
17 According to Grassi, Sponle, and their counsel, the trip to Arizona was "required by court
18 order" and "pursuant to court order."  (Doc. 13-1 at 4, 13-2 at 4); (Doc. 13-1 at 4, 13-2 at
19 4).  Given these statements, it is quite clear Grassi, Sponle, and defense counsel
20 subjectively believed the discovery order was binding on them.  Conferring process
21 immunity to Grassi and Sponle in these circumstances would run counter to the idea that
22 process immunity is only meant to incentivize voluntary attendance.  Rather than
23 promoting voluntary attendance, conferring process immunity to Grassi and Sponle
24 would simply be an inappropriate "windfall."  *U. S. Nat. Bank of Or. v. Great Republic*
25 *Life Ins. Co.*, 54 F.R.D. 498, 499 (D. Or. 1971).  Therefore, the first circumstance
26 involving the voluntary nature of appearing in the forum state is not present here.

27      The second circumstance involving the two cases being related is also present
28 here.  Grassi and Sponle concede they were in Arizona due to their involvement in the

1   other suit. That suit alleges Cains, Bailey, and Stonewall breached the purchase
2   agreement negotiated with Grassi by retrieving embryos without authorization. The
3   present suit alleges Grassi and Sponle spread false statements that Cains, Bailey, and
4   Stonewall retrieved the embryos without authorization. These two suits are not entirely
5   dependent on each other but they are substantially related. They involve the same parties
6   and many of the same underlying facts. Requiring such interrelated suits proceed in
7   different forums would be counter to "good judicial administration." *See* Immunity from
8   Service of Process—Immunity in Related Actions, 4A Fed. Prac. & Proc. Civ. § 1080
9   (4th ed.).

10   The contours of Arizona's process immunity are genuinely unclear. But Grassi
11   and Sponle believed they were in Arizona involuntarily and the two suits are closely
12   related. Under these circumstances, Grassi and Sponle were not immune from process
13   when they were served. Having been served while in Arizona, personal jurisdiction
14   exists.[3]

## III. Two of the Four Claims Must Be Dismissed

Beyond arguing personal jurisdiction does not exist, Grassi and Sponle also seek dismissal of the complaint based on a purported failure to allege sufficient facts. For two of the four claims in the complaint, Grassi and Sponle are correct.

One of Plaintiffs' four claims is for intentional infliction of emotional distress ("IIED"). To state a plausible IIED claim, the complaint must allege sufficient facts establishing three elements. First, there must be allegations of "extreme" and "outrageous" conduct by a defendant. *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz.

---

[3] Even if the Court were to conclude otherwise, Plaintiffs have made an adequate showing of personal jurisdiction at this stage. Because no evidentiary hearing has been held, Plaintiffs "need only make a prima facie showing of jurisdictional facts" to proceed with their claims. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quotation marks and citation omitted). For tort claims, personal jurisdiction will exist when a defendant commits an intentional act, expressly aimed at the forum state, that causes harm in the forum state. *Id.* at 1214. Grassi and Sponle allegedly made defamatory statements about Plaintiffs, who they knew were residents of Arizona. Moreover, Grassi and Sponle repeated these statements to other Arizona residents besides Plaintiffs. This is sufficient for a prima facie showing of jurisdiction.

1987).  Second, there must also be allegations establishing the conduct was intended "to cause emotional distress" or constituted reckless disregard of the "near certainty that such distress [would] result." *Id.*  And third, there must be allegations that "severe emotional distress [did] occur as a result of defendant's conduct." *Id.*

As best as can be determined, the "extreme" and "outrageous" conduct at issue here consisted of Grassi and Sponle telling third parties that Plaintiffs had "stole[n] horse embryos from Sheikh Ammar." (Doc. 12 at 7).  While this statement involves a unique subject matter, Plaintiffs do not cite any authority supporting their contention that, in context, the statement qualifies as sufficiently "extreme" or "outrageous."  To be actionable, a statement must "strike to the very core of one's being" and threaten "to shatter the frame upon which one's emotional fabric is hung." *Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987) (quotation marks and citation omitted).  Absent other factual allegations showing an accusation of embryo theft is particularly damning in the Arabian horse industry, the present allegations are not enough.  That is, Grassi and Sponle telling third parties that Plaintiffs were involved in misconduct in their business does not, at present, appear sufficiently "shatter[ing]" to support a claim for intentional infliction of emotional distress. *Id.*  This claim will be dismissed with leave to amend.

Plaintiffs also assert a claim for interference with contract.  That claims is based on allegations that "Knight had a contract with Ajman Stud," Grassi and Sponle interfered with that contract, and that interference caused a "breach or termination" of the contract. (Doc. 12 at 11).  This is simply a recital of the elements of the cause of action, which is not sufficient.  To be allowed to proceed, this claim would need to be supported by factual allegations establishing what, exactly, Grassi and Sponle are alleged to have done which led to the "breach or termination" of the contract.  This claim will be dismissed.

Plaintiffs' two remaining claims are for defamation and false light.[4]  Arizona law recognizes these as separate torts. *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d

---

[4] The defamation claim is brought by Plaintiffs but the false light claim is asserted

- 11 -

438, 449 (Ariz. Ct. App. 2015).  However, the distinction between the two is "subtle." *Id.*  In general, both torts involve a defendant publicizing something that either causes damage to a person's reputation or a person's "mental and emotional interests." *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989).  Accusing Plaintiffs of stealing horse embryos satisfies the elements for both defamation and false light.  Given that Plaintiffs work in the horse industry, a false accusation of embryo theft would plausibly damage Plaintiffs' reputations.  And this accusation could also plausibly harm the emotional interests of Cains and Bailey.  Therefore, these two claims will be allowed to proceed.

In sum, the claims for defamation and false light may proceed but the claims for intentional infliction of emotional distress and interference with contract will be dismissed with leave to amend.  Should Plaintiffs attempt to amend these claims, they must provide substantially more information regarding the basis for these claims.

Accordingly,

**IT IS ORDERED** the Motion to Dismiss (Doc. 13) is **GRANTED IN PART** and **DENIED IN PART**.  Should Plaintiffs wish to amend their complaint, they must do so no later than **October 14, 2016**.

**IT IS FURTHER ORDERED** the Motion for Leave to File Supplement (Doc. 19) is **DENIED AS MOOT**.

Dated this 4th day of October, 2016.

Honorable Roslyn O. Silver
Senior United States District Judge

---

only by Cains and Bailey.  (Doc. 12 at 9-10).